# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THE SATANIC TEMPLE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BOSTON, and MAYOR MICHELLE WU, in her official capacity,<br><br>Defendants. | CIVIL ACTION NO. 1:25-CV-11024-AK |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

The City of Boston (the "City") and Mayor Michelle Wu, in her official capacity[1] (together with the City, "Defendants"), submit this memorandum of law in support of their motion to dismiss the Complaint of the plaintiff, the Satanic Temple, Inc. ("TST," or "Plaintiff").[2] At its core, TST's Complaint simply contends that in recrafting and reimplementing the City's flag-raising policy for 2022 to the present, the City failed to follow the framework established in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022) for ensuring that the City's flying of flags other than its own is an

---

[1] As discussed in more detail herein, official capacity suits against City employees and officials are nothing more than suits against the City itself. *See*, *e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *see also Goldstein v. Galvin*, 719 F.3d 16, 23 (1st Cir. 2013).

[2] TST asserts five counts against the Defendants: (1) a free speech violation for refusing to grant TST's application to fly a flag; (2) a free speech violation for allegedly shutting down a public forum to silence disfavored speech within it; (3) a free speech/free exercise "hybrid" claim for refusing TST's application but permitting others; (4) an Establishment Clause violation for an alleged preference for Christians; and (5) violations of the Massachusetts Public Records Law, M.G.L. c. 66, § 10. The first four federal claims are presumably brought pursuant to 42 U.S.C. § 1983 ("§ 1983") and the Supreme Court's decision in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) ("*Monell*").

expression of government speech. Instead, TST contends, the flagpole remains a public forum. TST bases its contention on a belief that because the City produced no City Council resolutions or mayoral proclamations in response to a poorly-worded request that presumed the existence of an application process, none exist. TST is wrong in all respects. The Complaint should be dismissed.

### Preliminary Statement

TST is an atheistic religious organization that challenges practices of governments all over the country, particularly where there is some intersection of government and religion. TST previously sued the City over its legislative prayer practice in *Satanic Temple, Inc. v. City of Boston*, 111 F. 4th 156 (1st Cir. 2024). Seizing what it perceived to be an opportunity in the wake of the Supreme Court's May 2, 2022 decision in *Shurtleff* regarding the City's practice with respect to its third flagpole, on May 3, 2022 – ***the very next day*** – TST attempted to apply to have its flag flown. However, the City had suspended the program when the Supreme Court granted the petition for certiorari in *Shurtleff*. At all times the City intended the program to be government speech, a position that had been upheld previously by the District of Massachusetts and the First Circuit.

The Supreme Court disagreed. When the Supreme Court held that the flagpole was in fact a public forum under the City's program, the City took remedial steps to ensure that the flying of flags remains government speech under the newly-announced standard. Following the decision, the City began work on an ordinance that would keep the flagpole program within the boundaries of government speech pursuant to the test laid out in *Shurtleff*. TST contends that those remedial steps were a pretext, and that the City's flagpole remains a public forum. TST is wrong.

None of TST's claims are viable. TST's free speech and hybrid free speech/free exercise claims fail because the flagpole is no longer a public forum following the implementation of the ordinance containing the precise types of things – in writing – that would preserve the historical

practice of flag flying as government speech. The City no longer takes applications requesting flags be flown. Flags are chosen through proclamations by Mayor Wu and resolutions of the City Council outlining the City's reasons for flying the flag and the message it wishes to send. This is classic government speech and precisely what the *Shurtleff* Court suggested the City could do.

Alternatively, TST seeks to force the City to continue to operate under the old scheme and operate the flagpole as a public forum in perpetuity, under which it contends the City could not deny their application as it would be impermissible viewpoint discrimination. On the contrary, the City was free to shut down the public forum when it did. As the *Shurtleff* Court itself stated, "nothing prevents Boston from changing its policies going forward." 596 U.S. at 258. And contrary to TST's position, the City did not shut down the flagpole as a public forum to silence disfavored speech – the only disfavored speech under the old flag program was the Christian flag which the City was ultimately required to fly as court-ordered remedy in *Shurtleff*.

Should its other federal claims fail, TST finally argues that this court-ordered flying of the Christian flag under the old policy the day after the new ordinance was filed, but before it was effective, is a violation of the Establishment Clause. In other words, TST is hedging its bets – if the new flag program is now an expression of government speech, TST alleges that the City being forced to fly a Christian flag is an official preference of one denomination over another. First, it is worth reiterating that the City never wanted to fly the Christian flag; it was forced to do so because what it believed to be government speech was found to be a public forum. TST's bald assertions that the City permitted or selectively allowed the flag to be flown are unsupported by the documents attached to the Complaint. Second, the Christian flag was not flown as an expression of government speech. It was flown as a court-ordered remedy under the old policy. The ordinance had not gone into effect at the time of the flying of the flag, and there was no

ordinance or proclamation authorizing it.  The City was required to reopen the public forum for a

limited time to allow the flag to be flown.  There was no violation of the Establishment Clause.

This leaves only the state Public Records Claim.  The request at issue asked for resolutions

and proclamations *in response to applications*.  There were no applications, and the City does not

take them as part of the new flag-flying scheme.  That does not mean there were no resolutions

and proclamations.  There were many, one for every flag raising since the ordinance went into

effect.  This claim fails as a matter of law.  The Complaint should be dismissed.

### Relevant Factual Allegations[3]

On the Plaza at City Hall in Boston, the City traditionally maintains three flag poles, one

for the American Flag, one for the flag of the Commonwealth of Massachusetts, and a third which

ordinarily flies the official flag of the City of Boston.[4]  Historically, the City on occasion has flown

various other flags on the third flagpole in place of the City flag.[5]  This became an issue in 2017,

when the City declined to fly the flag of Camp Constitution, resulting in the *Shurtleff* litigation.[6]

In 2020, the District Court determined that the City's flag policy was government speech and

constitutional, a decision that the First Circuit affirmed in 2021.[7]  The Supreme Court granted

---

[3] Except where otherwise noted, the facts cited in this motion to dismiss are taken from Plaintiff's Complaint.  Defendants make no admission with respect to these factual allegations, but rather simply contend that these facts fail to give rise to an actionable claim against it.  Defendants further rely on the attached public records that were sufficiently relied upon and referred to by TST for the Court to consider them without converting the motion to one for summary judgment.  *See Waterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) ("… courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint").

[4] Complaint at Ex. 2.
[5] Complaint at Ex. 2.
[6] Complaint at Ex. 2.
[7] *Shurtleff v. City of Boston*, 613 F. Supp. 3d 528, 535 (D. Mass. 2020), *aff'd*, 986 F.3d 78 (1st Cir. 2021), *rev'd and remanded* 596 U.S. 243 (2022).

Shurtleff's petition for certiorari on September 30, 2021.[8]  When the Supreme Court granted the petition for certiorari in *Shurtleff*, the City suspended the flying of flags on the third flagpole other than the City flag.[9]

The Supreme Court reversed on May 2, 2022 and remanded the case for further proceedings.[10]  As part of that decision, the Supreme Court held that the City's then-existing flag raising program was not government speech and that the refusal to fly the Camp Constitution flag was a violation of the Free Speech Clause of the Constitution.  *Shurtleff*, 596 U.S. at 259.  The Court stated that the City "could easily have done more to make clear it wished to speak for itself by raising flags," referencing favorably a written policy of the City of San Jose, California that expressly stated that flagpoles are not a public forum and listed approved flags that may be flown as an expression of San Jose's official sentiments.  *Id*. at 257-58.  The *Shurtleff* Court noted that while the lack of meaningful involvement in the selection of flags lead it to classify the flag raisings as private rather than government speech, "nothing prevents Boston from changing its policies moving forward."  *Id*. at 258.

The City did change its policies to comply with *Shurtleff*, but that did not stop TST from filing this lawsuit.  TST describes itself as an atheistic religious organization.[11]  The day after the Supreme Court's decision in *Shurtleff*, TST attempted to apply to fly its flag on the flagpole through the City website on an "Event Application" for the use of Faneuil Hall, Sam Adams Park, City Hall Lobby, North Stage or the City Hall Flag Poles.[12]  As the Supreme Court noted, the City

---

[8] *Shurtleff v. City of Boston*, 142 S. Ct. 55 (2021).
[9] Complaint at Ex. 2.
[10] Complaint at ¶8.
[11] Complaint at ¶4.
[12] Complaint at ¶9.

considered the area at the flagpole's base a public forum and allowed events to be held there.[13]
*Shurtleff*, 596 U.S. at 249.  One day after TST attempted to apply to fly the flag, on May 4, 2022,
the City informed TST that it had placed all flag raisings on hold and that it would not fly TST's
flag as a result.[14]  In the interim, the City reached a settlement in the *Shurtleff* case and on July 22,
2022, the District Court issued a final consent order and judgment enjoining the City from
enforcing its prior flagpole policy against Shurtleff and Camp Constitution prohibiting their flag
on religious grounds.[15]  The Court also ordered the City to fly the flag that was the subject of the
lawsuit and the 2017 application for two hours on August 3, 2022.[16]

In an effort to comply with the test set forth by the Supreme Court for ensuring that the
flying of flags would remain government speech, on August 2, 2022 the City Council filed an
ordinance codifying official policy regarding the display of flags on City Hall Plaza.[17]  The
ordinance states that "[p]ursuant to **proclamation of the Mayor**, or **resolution of the City Council**,
other flags may be flown by the City in place of the City of Boston flag."[18] [emphasis added]  The
ordinance then set forth three categories of flags that may be flown and stated that the City will
take ownership of all of the flags flown in place of the City flag.[19]  The ordinance expressly states
that the "City's flagpoles are not intended to serve as a forum for free expression by the public."[20]
Mayor Wu issued a press release the same day as the ordinance expressly stating that the ordinance

---

[13] In fact, the City told Shurtleff and Camp Constitution that they could proceed with the event in
the public forum surrounding the flagpoles, but that they could not raise the flag.  *Shurtleff*, 596
U.S. at 250.
[14] Complaint at ¶11.
[15] Complaint at Ex. 1.
[16] Complaint at Ex. 1.
[17] Complaint at Ex. 2, Ex. 3.
[18] Complaint at Ex. 2.
[19] Complaint at Ex. 2.
[20] Complaint at Ex. 2.

was designed to allow for continued flag raising while complying with *Shurtleff*.[21]    The filing

Councilors were quoted in the press release indicating that the ordinance was designed to ensure

flag raisings were in fact government speech:

- "…codify a formal policy to use our flagpoles in ways that express our City's values and intended messages, as the Supreme Court decision allows us to do …" – Councilor Kenzie Bok

- "The flags we raise at City Hall Plaza should reflect and celebrate our City's values, and this ordinance lays out a formal process that will allow us to do that …" – Councilor Ed Flynn

- "This flag-raising ordinance clarifies and codifies the process for flag raisings and the messages that we as a city want to convey each time a ceremonial flag is raised."[22]  - Councilor Ruthzee Louijeune

The ordinance did not go into effect until it was passed by the City Council on August 10, 2022

and signed by the mayor on August 11, 2022.[23]  Since the ordinance went into effect, Boston has

flown a number of flags other than the City flag on the City flagpole.[24]  Mayoral proclamations or

City Council resolutions exist for all of them.  City Council resolutions are publicly available on

the City's legislative management system.[25]

TST points to the fact that the City flew a Caribbean American Heritage Month flag on the

City flagpole on June 7, 2024.[26]  That flag raising was authorized by a proclamation of Mayor Wu

---

[21] Complaint at Ex. 3.

[22] Complaint at Ex. 3.

[23] *See* Executed version of the City's Ordinance signed by the City Clerk and the Mayor, a copy of which is attached hereto as **Exhibit A**.  While the copy attached to the Complaint does not include these signatures, the Court can take judicial notice of the date the ordinance went into effect.  In addition, the press release attached to the Complaint as Exhibit 3 "announced the filing of an ordinance," not the ***passing*** of the ordinance, and Councilor Bok is quoted as hoping the Council "can put that law on the books ***next week***." [emphasis added] The ordinance was not in effect as of the date that the City raised the Camp Constitution flag.

[24] Complaint at ¶¶20, 22, 23, 24.

[25] https://boston.legistar.com/Legislation.aspx

[26] Complaint at ¶22.

declaring June to be Caribbean Heritage Month in the City of Boston.[27] Some other examples of

flag raisings authorized by mayoral proclamation include:

- Pan-African Flag (February 1, 2023, 2024 and 2025, May 19, 2023, May 20, 2024)
- Juneteenth Flag (June 16, 2023, June 17, 2024)
- Pride Flag (June 1, 2023 and June 3, 2024)
- U.S. Air Force (September 18, 2022, 2023 and 2024)
- U.S. Marine Corps (November 10, 2022, 2023 and 2024)
- U.S. Navy (October 13, 2022, 2023 and 2024, July 1 to July 6, 2024)
- U.S. Army (June 14, 2023 and 2024, October 18, 2024 to November 1, 2024)
- U.S. Space Force (December 20, 2024)
- Armed Forces (November 11, 2022, May 23, 2023, November 4, 2023, May 18, 2024, November 9, 2024)
- Medal of Honor (March 25, 2023, 2024 and 2025)
- Purple Heart (August 7, 2023 and 2024)
- POW/MIA (September 16, 2022, September 15, 2023, September 20, 2024)
- Veterans of Foreign Wars (September 30, 2024)
- Earthshot Union (November 30, 2022)
- Massachusetts Tribe at Ponkpoag (October 7 and Indigenous People's Day, 2022)
- Albania (November 28, 2022, November 26, 2023, November 28, 2024)
- Barbados (November 29, 2022, November 30, 2023, November 29, 2024)
- Cabo Verde (July 5, 2023 and 2024)
- Cuba (October 16, 2022, October 1, 2023 and October 6, 2024)
- Dominican Republic (February 27, 2023 and 2024 and August 16, 2024)
- Germany (October 3, 2024)
- India (August 15, 2023 and 2024)
- Ireland (March 17, 2023)
- Japan (February 23, 2025)
- Italy (September 30, 2022, October 4, 2023)
- Mexico (September 14, 2022 and 2023, September 16, 2024)
- Nigeria (October 28, 2022, October 3, 2022)
- Portugal (June 18, 2023, June 16, 2024)
- Puerto Rico (July 24, 2023)
- Ukraine (August 24, 2024)[28]

TST next points to the fact that the City flew the Trinidad and Tobago flag on August 28, 2024.[29]

---

[27] *See* Mayoral Proclamation dated June 7, 2024, a copy of which is attached hereto as **Exhibit B**.

[28] Copies of these mayoral proclamations and many other issues for flag raisings are attached hereto as **Exhibit C**. The exhibit includes all of the proclamations provided to counsel by the Mayor's Office. These proclamations are too numerous to list above.

[29] Complaint at ¶23.

That flag-raising was authorized by a resolution of the City Council celebrating the 62nd Anniversary of Trinidad and Tobago Independence Day.[30]  Other flag raisings authorized by publicly-available Council resolutions include:

- Ukraine (August 24, 2023)
- Taiwan (October 6, 2022, October 7, 2023 and October 5, 2024)
- Barbados (November 30, 2023 and November 29, 2024)
- Tu Hispaniad (October 11, 2023 and October 16, 2024)
- Venezuela (July 6, 2023)
- Massachusetts Tribe at Ponkpoag (October 7 and Indigenous People's Day, 2022)
- Haiti (May 18, 2023, May 17, 2024 and May 18, 2025)
- Greece (April 30, 2023)
- Brazil (September 7, 2024)
- Poland (May 3, 2024 and 2025)
- Montserrat (March 8, 2024 and May 2, 2025)
- Grenada (February 9, 2024)
- Ireland (March 13, 2024, March 12, 2025)
- Italy (October 2, 2024)
- Dominican Republic (February 27, 2025)[31]

Although often self-evident, these proclamations and resolutions articulate the flag's connection to the community or the reasons behind the Mayor or Council's decision to fly the flag as governmental speech.[32]

On February 7, 2024, TST made a public records request for:

All applications from May 1, 2022 to present to raise a flag pursuant to Ordinance § 1-3A.3(b); all mayoral proclamations to fly any granted applications; all city council resolutions to fly any granted applications; all bills of sale or like conveyances for flags on said granted applications; all communications pertaining to the consideration or denial of said applications; and all documents evidencing the legislative history of Ordinance § 1-3A / Ord. 2022 c. 6 (including without limitation, a revision

---

[30] *See* City Council Resolution Celebrating the 62nd Anniversary of Trinidad and Tobago Independence Day filed on August 7, 2024, a copy of which is attached hereto as **Exhibit D**.  This Council resolution is publicly available online through the legislative management system referenced in footnote 25.

[31] Copies of each of these resolutions were pulled from the City Council's publicly-available legislative management system and are attached hereto as **Exhibit E** for the Court's convenience.

[32] *See generally*, Exhibits B-E.

history of the ordinance, any meeting minutes or other notes reflecting discussion of same, and a list of author(s) of the ordinance)[33]

The City's Director of Public Records responded on June 3, 2024, indicating that records were uploaded to the Public Records Center regarding the legislative history of the ordinance.[34]  With respect to the remainder of the request, he informed TST that the City did not take applications to raise a flag (in the time period requested) and thus there were no records responsive to the remaining portions of the request, each of which presumed a granted or denied application existed.[35]  TST made no attempt to rephrase and resubmit the request to capture the Council resolutions and mayoral declarations attached as Exhibits to this memorandum.  The City received 8,671 total public records requests in 2023, and through the first six months of 2024 – the time frame in which the City was complying with TST's request – the City received 4,626 requests.[36]

## Argument

### I.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombley*, 550 U.S. at 557).   Rule 8 "does not unlock the doors of discovery for a

---

[33] Complaint at Ex. 4.
[34] Complaint at Ex. 7.
[35] Complaint at Ex. 7.
[36] https://content.boston.gov/departments/public-records/public-records-fees

plaintiff armed with nothing more than conclusions" and "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678-679.   While the First Circuit recognizes the importance of § 1983, it is also "aware of the impact of its misuse" and thus requires a § 1983 claimant to "at least set forth minimal facts, not subjective characterizations, as to who did what to whom and why."  *Dewey v. University of New Hampshire,* 694 F.2d 1, 3 (1st. Cir. 1982).   Thus, in order to survive this motion to dismiss, the facts contained in TST's Complaint must have "nudged their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 569.   TST's Complaint fails to accomplish that goal.

## II.    THE CITY FOLLOWED THE SUPREME COURT'S ROADMAP IN SHURTLEFF TO ENSURE THAT FLAGS FLOWN ON THE CITY'S FLAGPOLE REMAINED AN EXPRESSION OF GOVERNMENT SPEECH

Each of TST's claims in Count I (free speech) and Count III (hybrid free speech/free exercise) presumes that the City continued to operate the flagpole as a public forum in the wake of *Shurtleff*.  It did not.  TST's position is based on a belief that the ordinance was pretextual because the "City of Boston, the Boston City Council, and Mayor Wu have issued no proclamations, passed no resolutions" and "superficially passed an ordinance while continuing to carry on the status quo at the time of *Shurtleff*.[37]   TST's basis for this belief is what it calls a staunch refusal to provide documentation of a change in flagpole pattern or practice.  TST is wrong on both counts.  The documentation exists and is attached as Exhibits B-E.  It was never provided to TST because it was never properly requested.

"The First Amendment's Free Speech Clause does not prevent the government from declining to express a view."  *Shurtleff*, 596 U.S. at 251 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-469 (2009)).   "When the government wishes to state an opinion, to speak for

---

[37] Complaint at ¶47.

community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say … [t]hat must be true for government to work." *Id*. (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207-208 (2015). "[W]hen the government speaks for itself, the First Amendment does not demand airtime for all views." *Id*. at 247. "The line between a forum for private expression and the government's own speech is important, but not always clear." *Id*. In *Shurtleff,* the Supreme Court determined that at the time the City refused to fly Camp Constitution's flag in 2017, the City's flag program was on the wrong side of that line. That is no longer the case.

Determining the boundary between government speech and private expression is a "holistic inquiry," "driven by a case's context rather than rote application of rigid factors." *Id*. at 252. Here, where the City modified its flag program to follow the instruction given it by the Supreme Court of the United States, this inquiry demands a finding of government speech. Courts look to "the history of the expression at issue, the public's likely perception as to who (the government or a private person) is speaking and the extent to which the government has actively shaped or controlled the expression." *Id*. In its decision in *Shurtleff*, the Supreme Court held that the first factor weighed in favor of the City and the second factor did not resolve the issue. *Id*. at 255-256. Instead the Court held that the City's "lack of meaningful involvement in the selection of flags or the crafting of their messages leads us to classify the flag raising as private, not government speech – though nothing prevents Boston from changing its policies moving forward."

That is what occurred. While *Shurtleff* was pending in the Supreme Court, the City's program was shut down entirely. No applications were accepted – including TST's attempt to apply to fly its flag through the online events application. The City made this clear to TST two days after the decision came down. Within months, the City Council adopted an ordinance doing

the types of things that the *Shurtleff* Court looked favorably upon in the written policy of San Jose, expressly providing that the flagpoles were not intended to be a forum for free expression, listing approved flags, and requiring that any other flags be approved by Council resolution or mayoral proclamation. Quotes in a press release from the Mayor and the three City Councilors that filed the ordinance made clear the flagpole was to be used for public speech moving forward and the intent was to comply with *Shurtleff*. From that point forward, flags were flown only by Council resolution or mayoral proclamation. As the Supreme Court noted in *Shurtleff*, "Boston could easily have done more to make clear it wished to speak for itself by raising flags." So it did.

TST's hybrid free speech/free exercise claim is also premised on a factual fallacy, that the City "permitted the Christian group to raise a Christian flag" under the new ordinance. As discussed in connection with the Establishment Clause claim below, the City did not "permit" Shurtleff to fly the flag, it was ordered to do so as part of a consent decree of the District Court on remand in the *Shurtleff* litigation. Flying the flag was not a decision made under the new ordinance, but rather a remedy agreed to and ordered under the policy that existed in 2017, when Shurtleff made the request. Most importantly, TST's timing is off. While the Camp Constitution flag was flown one day after the filing of the ordinance, the ordinance did not go into effect until it was approved by the Council a week later and signed by Mayor Wu the following day. The City did not elect to fly the Camp Constitution flag as an expression of government speech under the new policy, it was forced to fly the flag on what was then a public forum under the old policy.

As the City is now meaningfully involved in the selection of the flags flown on the flagpole, it is no longer a public forum. The current flag policy is an expression of government speech under *Shurtleff*. The free speech and hybrid free speech/free exercise claims should be dismissed.

III.    **THE CITY WAS ENTITLED TO SHUT DOWN THE FLAGPOLE ONCE IT WAS CONCERNED IT WOULD BE HELD TO BE A PUBLIC FORUM**

In Count II, TST appears to suggest that in anticipation of the Supreme Court's potential determination that the City's then-existing flag-flying policies created a public forum, the City could not subsequently shut down the public forum and adopt new policies that would ensure that the City's flag-flying program was an expression of government speech under *Shurtleff*.  This argument is not only wrong, it is directly contradicted by the language of *Shurtleff* itself.  "All told, while the historical practice of flag flying at government buildings favors Boston, the city's lack of meaningful involvement in the selection of flags or the crafting of their messages leads us to classify the flag raisings as private, not government, speech—though ***nothing prevents Boston from changing its policies going forward.***"  *Shurtleff*, 596 U.S. at 258 (emphasis added).  That is precisely what the City did here.

"Although a state is ***not required to indefinitely retain the open character of the facility***, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (discussing category of public property which the government has "opened for use by the public as a place of expressive activity") (emphasis added).  As Justice Kennedy noted in a concurring opinion in *International Society for Krishna Consciousness, Inc. v. Lee*:

> In some sense the government always retains authority to close a public forum, by selling the property, changing its physical character, or changing its principal use. Otherwise the State would be prohibited from closing a park, or eliminating a street or sidewalk, which no one has understood the public forum doctrine to require.

505 U.S. 672, 699–700 (1992) (Kennedy, J., concurring).  "The government is free to change the nature of any nontraditional forum as it wishes."  *Ridley v. Massachusetts Bay Transportation*

14

*Authority*, 390 F.3d 65, 77 (1st Cir. 2004).[38]  As the First Circuit held in *Ridley*:

> Thus, even if MBTA's previous intent was to maintain a designated public forum, it would be free to decide *in good faith* to close the forum at any time. There is no evidence that the 2003 changes were adopted as a mere pretext to reject plaintiff's advertisements. To the contrary, ***the MBTA acted in response to expressed constitutional concerns about its prior guidelines, and cannot be faulted for trying to adhere more closely to the constitutional line***.

*Id*. (emphasis added); *see also Sons of Confederate Veterans v. City of Lexington, Va.*, 722 F.3d 224, 231 (4th Cir. 2013) (dismissing free speech claims where ordinance was lawfully enacted to close a designated public forum, regardless of motive or "clean hands"); *Rhames v. City of Biddeford*, 204 F. Supp. 2d 45, 53 (D. Me. 2002) ("It is true that a city should not be able to shut down a park or a bandshell temporarily so as to avoid a particular speech or a particular concert—that is not a viewpoint neutral measure and violates the First Amendment").  Here, the City's closing of the potentially public forum was not a pretext to reject certain flags, but an anticipation of the need to adhere to a constitutional bar for government speech made clear by *Shurtleff*.  The City did not close the public forum to prevent Camp Constitution's flag from being flown; it closed the forum, later flew the flag it did not want to fly pursuant to a court order, and then revamped the flag program to adhere more closely to the constitutional line *Shurtleff* established.

The City's decision to close the public forum when it became apparent that the Supreme Court might deem it such was in good faith.  It is clear that the City never intended its third flagpole to be a public forum, and the position that it was government speech was originally upheld by both the District Court and the First Circuit.  When it became apparent that the Supreme Court was likely to overturn the First Circuit and declare it a public forum, the City shut it down – not to

---

[38] The case cited by TST in its Complaint in support of this Count is inapplicable.  *See Student Gov't Ass'n v. Bd. of Trustees of University of Massachusetts*, 868 F.2d 473, 476 (1st Cir. 1989) ("Forum analysis is inappropriate in this case because the LSO is not a forum for purposes of the First Amendment").

suppress the free speech of Shurtleff and Camp Constitution, whose flag they would subsequently be required to fly by the District Court[39] – but to ensure that the flagpole would be viewed as an expression of government speech moving forward.  The Supreme Court invited the City to change its policy; the City accepted the invitation.  It was a good faith decision by the City to shut down the flagpole for flags other than that of the City.  Count II should be dismissed.

### IV.    FLYING THE CAMP CONSTITUTION FLAG PRIOR TO THE EFFECTIVE DATE OF THE ORDINANCE AND PURSUANT TO A COURT ORDER IN *SHURTLEFF* DID NOT VIOLATE THE ESTABLISHMENT CLAUSE

In Count IV, TST contends that if the flying of flags on the flagpole is government speech, the City violated the Establishment Clause by flying the flag of Camp Constitution.  In other words, TST contends that the City is attempting to proselytize by flying a flag for two hours – ***pursuant to a court order*** – that it fought for four years to avoid flying at an expense of over $2 million in opponents' legal fees.  TST contends that the City's reluctant compliance with the Court order to fly the Camp Constitution flag is an "official preference for Christians" and "selectively allowing a Christian Group to raise its flag on Boston's flagpole."  TST's absurd basis for Count IV fails both as a matter of law and fact.

"The first and basic question we must answer is whether Boston's flag-raising program constitutes government speech. If so, Boston may refuse flags based on viewpoint."  *Shurtleff*, 596 U.S. at 251; *see also Satanic Temple, Inc. v. City of Boston*, 2022 WL 20470745, at *3 (D. Mass. Dec. 6, 2022) ("The *Shurtleff* Court even acknowledged that had Boston's flag-raising program constituted government speech, 'Boston may [have] refuse[d] flags based on viewpoint'").  As set

---

[39] The City did not shut down the flagpole to prevent the flying of a particular flag; on the contrary, based on the allegations of the Complaint, there was only one flag the City refused to fly under the prior policy, and it flew that flag following the decision to shut down the public forum because it was required to do so by Court order.  The public forum was shut down by the City in response to *Shurtleff* and before TST asked to fly their flag.

forth above, the new City policy regarding flag raising falls within the framework of *Shurtleff*, and is government speech. Nonetheless, government speech must comport with the Establishment Clause. *See Summum*, 555 U.S. at 468. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). There are no factual allegations to support that this occurred.

TST pleads no facts to support that the City's forced decision to fly the Camp Constitution flag establishes a preference for Christians. Under the policy at issue in *Shurtleff*, the City expressed a desire not to fly any religious flags. It was that position that was deemed unconstitutional – under the free speech clause – because the flagpole was deemed to be a public forum. It is no longer a public forum. *Shurtleff* was decided under the policy that existed in 2017 – the court-ordered resolution of that case and raising of the "Christian" flag were for violation of that then-existing policy. That policy has now changed. The City flew the Christian flag a week prior to the enactment of the new policy not because of a preference for a particular religion, but because it was required to do so. The Christian flag was not flown under the new policy, but in resolution of the litigation regarding the old policy. The date the flag was flown was chosen on July 22, 2022, long before the ordinance was filed. The flag was flown on August 3, 2022, a week before the ordinance was actually adopted. The City did not choose to fly the Christian flag under the new policy, instead it was forced to fly the Christian flag under the old policy. There is no Establishment Clause violation and Count IV should be dismissed.

## V.    THERE WAS NO VIOLATION OF PUBLIC RECORDS LAW AS THE CITY HAS NO RECORDS RESPONSIVE TO THE SPECIFIC REQUESTS

TST's public records request, as it relates to documents other than the legislative history of the ordinance, are all premised on incorrect presumption – that the City's new flag-raising program under the ordinance had an application process. It did not. Informed of that fact in the

City's formal response to the records request, TST did nothing to rephrase the requests to get the documents that do exist – the Council resolutions and mayoral proclamations authorizing the flying of specific flags. TST didn't want those documents **unless** they were tied to a public application process because they establish that the flag-flying program expresses government speech. TST hoped the resolutions and proclamations were tied to an application, or did not exist at all, to support its argument that the flagpole remains a public forum under *Shurtleff*. It does not.

M.G.L. c. 66, §10 provides, in relevant part, that a records officer "shall at reasonable times and without reasonable delay permit inspection of or furnish a copy of any public record … not later than 10 days following the receipt of the request, provided that: (i) the request reasonably describes the public record sought; (ii) the public record is within the possession, custody or control of the agency or municipality that the records officer serves; and (iii) the records access officer receives payment of a reasonable fee as set forth in subsection (d)." M.G.L. c. 66, § 10A(c) authorizes a requestor to "initiate a civil action to enforce the requirements of this chapter." The superior court may award reasonable attorneys' fees and costs if the requester "obtains relief through a judicial order, consent decree or the provision of **requested** documents after the filing of a complaint." M.G.L. c. 66, § 10A(d)(2) [emphasis added].

The City does not: (1) dispute that the proclamations and resolutions attached hereto are public records; or (2) allege that those records fall within one of the exemptions in M.G.L. c. 4, § 7. Rather, the City's records department asserts that the records actually requested do not exist and thus are not in its "possession, custody or control." Those records that do exist were not reasonably described by the request, which (other than the legislative history portion to which the City responded) was premised on the existence of an application process:

> All **applications** from May 1, 2022 to present to raise a flag pursuant to Ordinance § 1-3A.3(b); all mayoral proclamations to fly any **granted**

> ***applications***; all city council resolutions to fly any ***granted applications***; all bills of sale or like conveyances for flags on said ***granted applications***; all communications pertaining to the ***consideration or denial of said applications*** … [emphasis added]

As the City informed TST in response to its attempt to use the event application to apply for a flag-raising, the City did not accept applications during that timeframe. When the ordinance was adopted, no application process was created because pursuant to the terms of the ordinance itself, the City's flagpoles are "not intended to serve as a public forum for free expression by the public." When the City's records official informed TST that there were no records because the City did not take applications, TST made no attempt to rephrase the request. Given the sheer volume of requests received annually, the City's records official should not be required to look beyond a literal reading of the request and parse the meaning of the language used. TST failed to state a claim that the City failed to produce responsive to TST's narrowly-tailored request for documents.

## VI.    THE CLAIMS AGAINST MAYOR WU IN HER OFFICIAL CAPACITY SHOULD BE DISMISSED AS REDUNDANT

Official capacity suits against City employees and officials are nothing more than suits against the City itself. *See*, *e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"). "This means, of course, that a public official, sued only in his official capacity, is a proxy for the government entity that employs him and is in privity with that entity." *Goldstein v. Galvin*, 719 F.3d 16, 23 (1st Cir. 2013). "When a municipality is sued directly, claims against municipal employees in their official capacities are redundant and may be dismissed." *Martone Place, LLC v. City of Springfield*, 2017 WL 5889222, at \*19, n. 20 (D. Mass. Nov. 29, 2017), *aff'd*, 2018 WL 11231884 (1st Cir. 2018). Here, the only purpose in naming Mayor Wu in an official capacity is

to attach her name to the lawsuit – as a City official named officially in a lawsuit in which the City

is a defendant, the claims against her are redundant and should be dismissed.

## Conclusion

For the reasons set forth herein, Defendants respectfully request that this Honorable Court

grant their motion, dismiss all counts of Plaintiff's Complaint asserted against them, and grant

such other and further relief as it deems just and proper.

Dated:  May 19, 2025                          Respectfully submitted,
                                              **THE CITY OF BOSTON and MAYOR
                                              MICHELLE WU, in her official capacity,**

                                              By their attorney:

                                              ADAM CEDERBAUM
                                              Corporation Counsel


                                              /s/ Edward F. Whitesell, Jr.
                                              Edward F. Whitesell, Jr. (BBO#644331)
                                              Senior Assistant Corporation Counsel
                                              City of Boston Law Department
                                              Room 615, City Hall
                                              Boston, MA 02201
                                              (617) 635-4045 (EFW)
                                              edward.whitesell@boston.gov


## Certificate of Service

I, Edward F. Whitesell, Jr., hereby certify that on May 19, 2025, a true and correct copy of
this document filed through the ECF system will be sent electronically to the registered participants
as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated
as non-registered participants.


                                              /s/ Edward F. Whitesell, Jr.
                                              Edward F. Whitesell, Jr.