UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:25-CV-11024-AK

The Satanic Temple, Inc., )
                    *Plaintiff* )
                                )
        vs.                     )
                                )
City of Boston,                 )
                *Defendant*,     )
                                )
Michelle Wu, in her official capacity, )
                *Defendant*.     )
                                )
                                )
                                )

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Now comes the Plaintiff, The Satanic Temple, Inc. ("TST"), which opposes the Motion to Dismiss filed by the Defendants, The City of Boston and Michelle Wu (jointly, "Boston").

## INTRODUCTION

The Court should decline Boston's invitation to accept unverified facts outside the complaint. It is the complaint which binds at this stage, and the complaint provides well-pleaded factual allegations which plausibly show constitutional violations and public records violations.

First, the complaint plausibly alleges that nothing changed in the one intervening day between *Shurtleff* being published and TST's application being made. No less so than on the day before TST's application, Boston's flag-raising program consisted of a 15-year history of uniformly granted applications, which pattern and practice cemented the Boston's flag-raising program in public understanding as private speech. Indeed, Boston had never before attempted to exercise control over the messages communicated through its flag-raising program. As alleged, the

flag raising program was still a public forum when TST made its application, and (irrespective of discriminatory intent) it was just as unconstitutional for Boston to deny TST as it was to deny Shurtleff. Boston's motion says that it changed the program, but the program was not changed until months after Boston denied TST's application. It is the date of denial which controls Count 1.

Second, the complaint plausibly alleges that Boston shut down the public forum because it did not like the speech taking place within it. Boston responds that TST's cited authority does not bind, but Boston's cited authority says nothing different. Boston also claims that it shut down the forum to ensure the Flag Pole "remained" government speech. However, it was never government speech in the first place. *See Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243 (2022). As pleaded, Boston shut down a public forum to silence disfavored speech. Under binding First Circuit precedent (which *Shurtleff* left unaffected), Boston has violated the First Amendment.

Third, the complaint plausibly alleges that Boston uniquely excluded TST from its flag-raising program. Other flag-raisings are occurring, and according to Boston's public records response, those flag-raisings are a continuation of its pre-*Shurtleff* course of conduct. Boston responds that it changed its policy, but as in Count 1 it did not change its policy until *after* denying TST's application. Once Boston opened the door to religion by flying the Christian Group's flag, Boston had to accommodate *all* religions including TST on equal footing.

Fourth, the complaint plausibly alleges that Boston unconstitutionally showed preference for Christians by granting a Christian Group—*only* a Christian Group—whole-cloth exemptions from all regulations, past and future, on the Flag Pole. Boston responds that it had to accommodate Christians under *Shurtleff*, but that opinion only stands for the proposition that Shurtleff was entitled to *equal* treatment, not favorable treatment. If, as Boston contends, it was powerless to deny the Christian flag-raising application then it was equally powerless to deny TST's flag-raising

application. It cannot grant the former and deny the latter without violating the Establishment Clause.

Fifth, the complaint plausibly alleges that Boston violated public records law by failing to timely respond, and by illegally prevaricating about the documents within its control. Boston ignores its untimeliness and offers a game of semantics to justify why it did not provide the public records it now admits it had all along (and improperly seeks to rely upon in its motion). Contrary to Boston's brief, all authorities agree that a public records request need only *reasonably* describe the documents. Boston understood the scope of the request and chose to withhold them in violation of the law. Further, even Boston's game of semantics is wrong: even under Boston's strained interpretation of the request, at least one application was responsive to the request: TST's.

The Court should deny Boston's motion in full.

## FACTUAL BACKGROUND

Since at least 2005, Boston has allowed groups to hold flag-raising ceremonies at City Hall Plaza. Compl. ¶ 7; *see also Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 249 (2022) ("For years, since at least 2005, the city has allowed groups to hold flag-raising ceremonies on the plaza."). From 2017-2022, Boston engaged in a litigation effort to control this private speech, uniquely to preclude a Christian Group from having equal access to this public forum. *See id.* at 248-258. Boston lost that effort when the United States Supreme Court unanimously held that the flag-raising program was a public forum, and Boston could not pick and choose among applicants. Compl. ¶ 8; *id.*

One day after *Shurtleff* was published, TST applied to participate in a flag-raising on equal footing as had been made available to any other member of the public since at least 15 years beforehand. Compl. ¶¶ 9-10. TST made its application through Boston's website, which expressly

invites requests to use the Flag Pole for the purpose TST applied. Compl. ¶ 10. TST's application, if granted, would have allayed Boston's *Shurtleff* argument that accommodating a Christian group's private speech (same as it had accommodated every other group's) would be an unconstitutional preference for Christianity. *Id.* at 258. Rather than give equal treatment to all religions, as the Constitution requires, Boston instead resolved to give that Christian Group—*only* that Christian Group—preferential treatment under the law. Compl. Ex. 1 (Doc. 1-2, at 2-3). Although TST's application was identically situated as the Christian Group's, TST did not get a similar regulatory exception. Compl. ¶ 11.

Months after Boston denied TST's application, Boston publicly declared that all future flag-raisings would be "an expression of the City's official sentiments." Compl. ¶ 14; Compl. Ex. 2 (Doc. 1-4, at 3). It did so by filing a new flag-raising ordinance which states as much in so many words, and by issuing a mayoral press release to the same effect. Compl. ¶¶ 14-15; Compl. Ex. 2-3 (Docs. 1-4, 1-5). The next day, Boston flew the Christian Group's flag and has refused to fly TST's flag ever since. Compl. ¶¶ 17-18.

Ostensibly, under Boston's new flag-raising ordinance, all non-Boston flag raisings must be conducted pursuant a Mayoral Proclamation or City Council Resolution and must be attended by the City taking legal ownership of the flag to be raised. Compl. Ex. 2. Nevertheless, non-Boston flags have been getting raised since. Compl. ¶¶ 20-24. None of those have been attended or participated in by city officials. Compl. ¶ 25. So, to evaluate whether Boston is actually following that ordinance or if the policy is a mere pretext, Compl. ¶ 26, TST issued a public records request— going back to two days before its own application—for all applications to fly a non-Boston flag; all Mayoral Proclamations or City Council Resolutions to fly a non-Boston flag; all legal conveyances for non-Boston flags which have been flown; all related communications; and

legislative history of the ordinance, "including *without limitation,* revision history of the ordinance, any meeting minutes or other notes reflecting discussion of same, and a list of author(s) of the ordinance." Compl. ¶ 26.

Boston had ten business days to respond. Compl. ¶ 27. Twelve business days later, it invoked an extension. Compl. ¶ 28. Boston never responded within the extended timeframe. Compl. ¶ 29. TST followed-up, but Boston ignored it. Compl. ¶¶ 30-31. After the supervisor of public records directed Boston to respond, Boston eventually responded (83 business days after the request) that no responsive records existed because it does not accept applications to fly non-Boston flags. Compl. ¶¶ 32-34. That was a lie. Compl. ¶¶ 10, 35.

However, Boston *did* accept applications to raise non-Boston flags within the time sought, because at least TST's application was responsive to the request. Compl. ¶¶ 10, 35. Someone had to write the ordinance, but Boston did not provide the name of its authors. Compl. ¶¶ 28, 38. There must have been some meetings or other notes reflecting discussion of what culminated in the ordinance, but Boston did not provide that either. Compl. ¶¶ 28, 38. There must be legal conveyances for the flags Boston is flying, but Boston did not provide those either. Compl. ¶¶ 28, 38. And there must be Mayoral Proclamations and City Council Resolutions, as well as the petitions or applications that precipitated them, yet Boston did not provide any of these either. Compl. ¶¶ 28, 38.

The complaint alleges that Boston's ordinance is mere pretext, and Boston is simply carrying on as it did before *Shurtleff* and the flag raising ceremony is still a public forum. Compl. ¶¶ 47-48. TST sued under the same theory the Christian Group did: Boston violated TST's Free Speech rights by selectively excluding TST from a public forum. TST adds a hybrid Free Speech / Free Exercise claim to compel the same treatment afforded to the Christian Group, an

Establishment Clause claim for preferentially accommodating only Christians, and a public records violation for failing to timely respond, and wrongfully withholding documents responsive to the request. Boston has now moved to dismiss.

## ARGUMENT

The law requires this Court to "accept all well-pleaded facts as true, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff," where "well-pleaded facts" are those which set forth more than "mere labels and conclusions." *Satanic Temple, Inc. v. City of Bos., MA*, No. 21-CV-10102-ADB, 2021 WL 3079868, at *2 (D. Mass. July 21, 2021). Boston's motion to dismiss repeatedly deviates from the legal standard by injecting its view of the facts without conforming to summary judgment standards. *See* FRCP 12(d).

Nowhere attached to Boston's motion is an affidavit, based upon personal knowledge, that the various documents it attaches are true and correct copies of city records, nor that those unverified city records truly and accurately describe the events they purport to report. *See* FRCP 56(c)(4); FRE 803(6) (business records exception). It is the allegations of the complaint which bind at this stage, not Boston's preferred view of the facts based on unverified documents outside the pleadings. As discussed in turn below, the complaint plausibly alleges the constitutional violations it asserts, so the Court should deny the motion to dismiss in full.

## I.    Boston Violated TST's Free Speech Rights by Denying Its Application.

Count I asserts that Boston violated the Free Speech Clause of the First Amendment by denying TST's May 3, 2022 application to raise a flag on the City Hall Flag Pole. U.S. Const. Amend. I (Boston may not "abridge" TST's "speech"); 42 USC § 1983. A free speech analysis follows a three-step analysis: (1) determine whether–on May 3, 2022–raising a flag was protected

speech; (2) if so, identify the nature of the forum in which flag raising took place; and (3) "assess whether the justifications for exclusion from the relevant forum satisfies the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

> ### i. On May 3, 2022, raising a flag was protected speech.

To ascertain whether an act is private speech, courts consider: (1) the history of the expression at issue; (2) the public's likely perception as to who (the government or a private person) is speaking; and (3) the extent to which the government has actively shaped or controlled the expression. *See Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 252 (2022). On May 2, 2022, the Supreme Court considered these factors and unanimously held that Boston's act of raising flags on the Flag Pole was "private speech," not "government speech." *Id.* at 253-258.

The complaint alleges, and the Court is bound to find, that the facts upon which the Supreme Court made its decision did not change in the intervening day before TST filed its application. Compl. ¶ 45. On May 3, 2022–no less so than on May 2, 2022–the act of flying a flag was still private speech. *Id.* The history behind the flag-raising program, no less so than the day beforehand, was a practice of approving all flag-raising requests, without exception. *Id.* at 257. The public perception that this flag-raising program was "private speech" was cemented by a unanimous Supreme Court holding. *See id.* And at no point, as of May 3, 2022, had Boston ever asserted lawful control over the expression. *See id.* That did not even *allegedly* change until months *after* TST's application.

According to the complaint, to which this Court is bound, the facts on May 3 were no different than on May 2. The *Shurtleff* Court held that the act of flag-raising was "private speech," not "government speech." No amount of bare arguments can change this factual reality.

*ii.  The City Hall Flag Pole was a "public forum."*

Boston was constitutionally bound to accept TST's application for the same reason it was bound to approve of the Christian Group's application: Boston established a public forum (not a limited public forum) when it elected to make flag raising ceremonies generally available to all regardless of topic. *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44-45 (1983); *see also Shurtleff*, 596 U.S. at 280 (Gorsuch, J., concurring) ("that route [denying the Christian group's application] only invited years of litigation and a unanimous adverse decision because no government may discriminate against religious speech *in a public forum*") (emphasis added). On May 3, 2022, no less so than the day beforehand, the Flag Pole was a public forum.

*iii.  Boston's justification for exclusion does not satisfy the requisite standard.*

Having created a public forum, Boston was bound to follow straightforward rules. Boston "may not prohibit all communicative activity" and if it seeks to "enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45. The complaint asserts a content-based exclusion. As alleged, the decision to not fly TST's flag was a content-based decision. But for TST falling outside of Boston's "city-approved values or views," Boston would have granted TST's application. Compl. ¶ 43. The standard does not allow the Court to deviate from that factual predicate at this stage. Because Boston engaged in a content-based exclusion, it has the burden to prove that the denial was "necessary to serve a compelling state interest and that it [was] narrowly drawn to achieve that end." *Id.*

Contrary to the allegations of the complaint, Boston would instead have the Court find that upon the Supreme Court granting certiorari in *Shurtleff*, Boston saw the writing on the wall and "suspended the flying of flags … other than the City flag." Doc. 8, at 5. This contention is belied

by the fact that, at least as of May 3, 2022, Boston was continuing to solicit applications to raise a flag on the Flag Pole. *See* Compl. ¶ 10 ("Use this form to request the use of … the City Hall Flag Poles" and providing a checkbox for "City Hall Flag Poles"). As alleged, Boston did not stop flying flags, it was being covert about selectively granting applications. TST did not make the cut, which is a content-based exclusion, so Boston must prove that the denial was necessary to serve a compelling state interest and that the denial was narrowly drawn to achieve that end. *See Perry*, *supra.*

But even if the Court was inclined to engage in evidence-weighing at the pleadings stage, without an opportunity for discovery, Boston's claim to have silenced all speech before it changed the policy still does not satisfy the standard. Reserving the use of a public forum to only city-approved views is viewpoint discrimination regardless of whether the whitelist includes all views (except religion) or just the City's own. *See Matal v. Tam*, 582 U.S. 218, 235 (2017) ("If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints"). Even if the Court agreed that Boston shut down all communicative activity in this adjudicated public forum, that would still violate the rule that "the government may *not* prohibit all communicative activity" in a public forum. *Perry*, 460 U.S. at 45.

Because Boston could neither silence all speech in this public forum nor could it reserve this public forum for its own views, Boston violated TST's Free Speech rights by denying the application. Boston may as well have prohibited TST members from expressing their views at City Hall Plaza, or in any public park. *See Shurtleff*, 596 U.S. at 249 ("Boston acknowledges that this means the plaza is a 'public forum'"). Because the denial was presumptively unconstitutional, Count I states a valid claim. The Court must deny Boston's motion.

II.    <u>**Boston Closed the Forum to Silence Disfavored Speech.**</u>

Count II asserts an ongoing Free Speech violation because Boston closed an adjudicated public forum to silence speech it disagrees with. *See Student Gov't Ass'n v. Bd. of Trustees of Univ. of Massachusetts*, 868 F.2d 473, 480 (1st Cir. 1989). Boston's brief asserts that *Student Gov't Ass'n* is inapplicable because it did not involve a forum. *See* Doc. 8, at 15 n. 38. But this argument is derived from a legal treatise. *See id.* (citing L. Tribe, *American Constitutional Law* § 12–24 (2d ed. 1988)). Another court has squarely addressed this issue. *See Missouri Knights of the Ku Klux Klan v. Kansas City, Mo.*, 723 F. Supp. 1347 (W.D. Mo. 1989).

There, the Ku Klux Klan applied to run a weekly show on the community public access channel. *See Missouri Knights of the Ku Klux Klan*, 723 F. Supp. at 1349. Desiring to suppress this disfavored speech, the city council and cable company amended the cable-franchise contract to allow the cable company to delete the public access channel. *See id.* at 1349-50. The cable company then created a new channel which would accommodate former public access users while utilizing the company's editorial control to prevent "extremist" programming. *See id.* at 1350. This scheme did not pass constitutional muster because, "[w]hether the exclusion is accomplished by individual censorship *or elimination of the forum* is inconsequential; the result is the same." *Id.* at 1352 (emphasis added). Ultimately the court held that "[a] state may only eliminate a designated public forum if it does so in a manner consistent with the First Amendment." *Id.* at 1352.

Boston contends it is "free to change the nature of any nontraditional forum as it wishes." Doc 8, at 14-15 (quoting *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 77 (1st Cir. 2004)). But the *Ridley* Court's very next sentence provides that a government is "free to decide *in good faith* to close the forum at any time." *Ridley*, *supra* (emphasis in original). The complaint alleges, and the Court is bound to find, Boston did not change the Flag Pole policy "in good faith,"

it did it to silence disfavored views. Compl ¶¶ 50-51. Such a rule change violated "a fundamental principle of the First Amendment [, *i.e.*,] that the government may *not* punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Matal*, 582 U.S. at 248 (Alito, J., concurring) (emphasis added); *see also Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional"). Having created its public forum, Boston could not silence private speech occurring within it, not by selectively denying applications and not by shutting down the forum. Its change in policy was merely a "ruse for impermissible viewpoint discrimination," which is presumptively unconstitutional. *Ridley*, *supra*, at 77.; *see also Rosenberger*, 515 U.S. at 828. Boston could change its policy for constitutionally valid reasons, not constitutionally invalid ones.

Boston retorts that the Supreme Court *invited* Boston to "chang[e] its policies going forward." Doc. 8, at 14-16 ("invited" at 16); *Shurtleff*, 596 U.S. at 258. Boston is wrong because the Supreme Court does not issue advisory opinions. *See, e.g.*, *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) ("The federal courts … do not render advisory opinions"). It is a foundational precept that adjudication of constitutional issues requires "concrete legal issues, presented in actual cases, not abstractions." *Id.* At issue in *Shurtleff* was not Boston's decision to close the forum, but Boston's refusal to follow basic rules when implementing a public forum. If Boston thought the Supreme Court issued an advisory opinion that Boston could close the forum for any reason, even to silence disfavored speech occurring within it, it thought wrong.

## III.   TST Pleaded a Plausible Free Speech / Free Exercise Claim.

Count III asserts that Boston was constitutionally obligated to allow TST an equal opportunity to raise a Satanic flag after Boston allowed the Christian Group to fly its flag. When

Boston did not extend that equal opportunity, it engaged in both content-based discrimination of speech and differential treatment among religions. Even if Boston's decision to change its flag-raising policy were permissible, it did not *allegedly* change that policy until months *after* TST's application. When TST made its application, the flagpole was a public forum and TST had an equal right to participate in that forum as any other member of the public.

Boston's brief blurs the distinction between Counts I and III. Count I asserts that it was a violation to refuse to fly TST's flag after its application, irrespective of discriminatory intent. Count III asserts that it was religious discrimination to fly the Christian flag but never fly TST's flag (or any other religious flags) thereafter.

A pretextual change of policy does not change that outcome. See Compl. ¶¶ 46-47. Boston contends that the ordinance is not a pretext. Doc. 8, at 11. But Boston's unverified attachments do not even attempt to rebut the allegation that all flags, even since the ordinance, have been the product of "informal requests by various members of the public." Compl. ¶ 24. At this stage, the Court is bound to find that various members of the public are petitioning their government to allow a flag-raising ceremony, and those are being granted as a matter of course just as described in *Shurtleff*. Compl. ¶¶ 46-47.

It is faulty logic that constitutionally must be rejected to suggest that Boston can change its policy after TST's application, only to use the changed policy to justify the denial of TST's application. Doc. 8, at 11-13. That would be like saying that Boston wouldn't have to fly the Christian flag–*Shurtleff* notwithstanding–because they allegedly stopped flying flags before *Shurtleff* was decided. TST's right to equally participate in the forum was established when Boston elected to create this public forum back in at least 2005. That right did not cease when Boston changed its mind; the earliest it could cease is when Boston changed its *policy*. Even if this Court

were to disregard the allegation that the ordinance is a pretext, Boston should have granted TST's application because it was made prior to any claim of a change in the flag-raising policy.

The instant Boston allowed the Christian Group's flag-raising ceremony, it resumed the pattern and practice of "accommodat[ing] all applicants" who wished to hold events at Boston's "public forums," including flag raising ceremonies, and approving all flag raisings, "without exception." *See Shurtleff*, 596 U.S. at 257. At that point, TST (no less than the Christian Group before it) had an equal right to fly its flag as Boston had extended to the "dozens" of different flags by "hundreds" of uniformly approved requests. *Shurtleff*, 596 U.S. at 248. As established by the complaint, and bolstered by admissions in Boston's own brief, Boston has resumed its practice of flying dozens of different flags since May 2, 2022. Doc. 8, Just as in *Shurtleff*, Boston is flying everyone's flags–except TST's. That is viewpoint discrimination on the basis of religion, is a continuation of Boston's pre-*Shurtleff* practice of excluding religion from this public forum, is factually indistinguishable from *Shurtleff*, and is therefore a violation of TST's hybrid Free Speech / Free Exercise Clause rights. Count III states a plausible claim, so the motion must be denied.

### IV.    TST Pleaded a Plausible Establishment Clause Claim.

Count IV asserts that Boston unconstitutionally showed a preference for Christianity by announcing on August 2, 2024 that all future flags would be the "official viewpoint" of the City of Boston, and then flying the Christian flag the next day. *See* Compl. ¶¶ 14-15. Government endorsement of particular religious views is impermissible under the Establishment Clause because it sends a message to nonadherents "that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309–10 (2000).

Despite offering no affidavits to substantiate the claim, Boston contends that the Christian flag was raised under the old pattern and practice described in *Shurtleff* and was not the "official sentiments" of Boston. Doc. 8, at 7, 16-17. Boston's argument asks this Court to consider facts outside the complaint without the requisite declarations to support summary judgment. *See* FRCP 12(d) (a court may entertain matters outside the complaint, but only under the standards for a summary judgment); FRCP 56(c)(4) (a summary judgment must be supported by affidavits "made on personal knowledge" which "set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"). It would be reversible error to credit Boston's argument at this stage. This Court is bound at this stage to rule that Boston announced that all flags moving forward will be the official voice of Boston, and flew the Christian flag the next day.

Even if the Court were inclined to engage in evidence-weighing at the pleadings stage, without any actual evidence, Boston's contention is belied by its own consent decree. Boston agreed to be permanently restrained from enforcing any regulatory framework that would ever prohibit the raising of the Christian flag. *See* Compl. Ex. 1, Doc. 1-3, at 2-3 (Boston is permanently enjoined from enforcing any flag raising policies "on *or after* July 28, 2017 … [which] prohibited the raising of Plaintiffs' Christian flag on the City Hall Flag Poles") (emphasis added).

It would do Boston no favors even if the Court were to rule that the Christian flag was raised before Boston effectively changed its policy. If, as Boston contends, the Christian flag were only given equal treatment to participate in the public forum, then discovery is needed to answer why TST was not given the same treatment. Every two-hour period after the Christian flag raising was another chance that Boston could have allowed TST to raise its flag. Boston chose not to afford TST that chance. Under its proffered facts, Boston has chosen not to afford *any* religions–

other than Christians–that chance. Giving Christians exclusive access to broadcast their message using public property violates "the clearest command of the Establishment Clause [] that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

Boston's brief contests that it flew the Christian Flag because it had to. But *Shurtleff* stands for the proposition that the Christian Group is entitled to *equal* treatment, not favorable treatment. When Boston agreed to allow a Christian flag-raising ceremony, and no other religions, Boston gave favorable treatment to that particular religious group. And when Boston announced that all future flags would be the official sentiment of Boston, then flew the Christian flag the next day, Boston gave unconstitutional favorable treatment to a particular religious group. Count IV states a plausible Establishment Clause claim, so the Court must deny the motion to dismiss.

**V.    TST Pleaded a Plausible Open Records Claim.**

Finally, Count V asserts the violation of TST's right to inspect public records when it untimely and falsely claimed to have no public records responsive to TST's open records request. *See* M.G. L. c. 66, § 10A(c). Boston now admits it had the requested records all along, and understood what documents were sought, but refused to provide them because it chose to take the narrowest possible construction of the request. *See* Doc 8, at 19 ("the City's records official should not be required to look beyond a literal reading of the request and parse the meaning of the language used").

Boston offers no substantiating authority for its position because the authorities directly undermine it. *See*, *e.g.*, M.G. L. c. 66, § 10(a)(i) (a request need only "reasonably" describe the public records sought); 950 Mass. Code Regs. 32.06(1)(b) ("requests for public records shall include a *reasonable description* of the requested record to the records access officer so that the

records can be identified and located promptly") (emphasis added). The test is whether "a professional employee of the agency who was familiar with the subject area of the request to locate the record[s] with a reasonable amount of effort." *Friedman v. Div. of Admin. L. Appeals*, 103 Mass. App. Ct. 806, 819 (2024). Public records requests are not assessed by Boston's proffered "literal reading" standard; they are governed by a "reasonable description" standard. *Ibid*.

Boston offers no argument that it was not reasonably able to identify and locate the records; instead, it readily admits that it knew precisely what was asked for and chose to play semantics. The Massachusetts Supreme Judicial Court, the ultimate authority on defining the statute, rejects such games. *See Rahim v. Dist. Att'y for Suffolk Dist.*, 486 Mass. 544, 547-48 (2020). There, an open records request was made for documents "received" by the district attorney from the FBI. *See id*. at 544. The district attorney refused to provide the records, arguing the word "received" implies ownership, so the FBI materials were not within the scope of the public records statute. *See id.* at 547. The *Rahim* Court applied Merriam-Webster's Dictionary and Black's Law Dictionary to define "receive" to mean "take possession or delivery of," not to "own." *Id.* The *Rahim* Court also noted the purpose of the public records law is to provide "the public broad access to governmental records." *Id.* at 548. Massachusetts law holds that records requests are to be broadly interpreted as to promote *greater* government transparency, not stymie it. *See id.*

Boston's linguistic legerdemain is similarly unavailing. Boston claims that its records official "should not be required to look beyond a literal reading of the request." Doc. 8, at 19. But if the official were inclined to consider the "literal reading," he would have consulted a dictionary. Merriam-Webster's Online Dictionary and Black's Law Dictionary both define *application* as

synonymous with "request" and "petition."[1] *Request*, in turn is "something asked for" or "the state of being sought after" (synonymous with *demand*).[2] *Petition* is similarly defined as "a formal written request made to an authority or organized body (such as a court)."[3]

The "literal reading" of *application* meant Boston needed to hand over any *request* to raise a flag, whether the request was formal or informal. For example, the City Council's resolution "*requesting* a flag raising" to celebrate Brazil's independence would have reasonably fallen within the request. Doc. 8-5, at 4 (emphasis added). Boston had that document, but did not provide it. If this dictionary understanding were lost on Boston's Director of Public Records, he should have done as the regulations require: "assist[ed] persons seeking public records to identify the records sought." 950 Mass. Code Regs. 32.04(5)(b). He did not do that. Nor did he apply his superior understanding of his own records to infer what documents could be reasonably described as an *application*, as required. *See* 950 Mass. Code Regs. 32.06(1)(b). He instead took the narrowest possible construction to refuse the request, which violates both the letter and spirit of the law.

And if Boston's Director of Public Records really did construe the word "applications" to mean "web form applications," TST issued one through Boston's electronic form on May 3, 2022– two days after the beginning date of the request. *See* Compl. ¶¶ 10, 35. That application falls within even Boston's twisted interpretation, yet it was not provided either. *Compare* Doc. 8, at 19 ("the

---

[1]     *Merriam-Webster's     Online     Dictionary*,     APPLICATION     available     at https://www.merriam-webster.com/dictionary/application (last visited May 23, 2025); *see also* Black's Law Dictionary, APPLICATION (12th ed. 2024).

[2]     *Merriam-Webster's     Online     Dictionary*,     REQUEST     available     at https://www.merriam-webster.com/dictionary/request (last visited May 23, 2025)

[3]     *Merriam-Webster's     Online     Dictionary*,     PETITION     available     at https://www.merriam-webster.com/dictionary/petition (last visited May 23, 2025)

City did not accept applications during that timeframe"); *with* Compl. ¶ 10 (an application made to the City, through its own web form, during the time frame of the inquiry sought). Boston's Director of Public Records made a misrepresentation when he said "[t]he City of Boston does not take applications to raise a flag." Compl. ¶ 34, Compl. Ex. 7. Clearly, it did. Compl. ¶ 10. Withholding responsive documents on false pretenses was another violation of the statute.

Boston's brief also sidesteps the issue of its repeated failures to timely respond to the public records request. The public records law does not permit a response whenever a municipality chooses to get around to it; it has 10 business days to respond. *See* M.G. L. c. 66, § 10(b) (the municipality "shall" respond "not later than 10 business days after the initial request"); *Globe Newspaper Co. v. Comm'r of Educ.*, 439 Mass. 124, 131 (2003) ("Public records must be released for inspection and copying without unreasonable delay, that is, within ten days of the receipt of a request for them"). Boston chose to not respond within 10 business days, did not respond within its own tardy extension, and ignored TST's follow-up inquiry. *See* Compl. ¶¶ 26-31. Boston's repeated failures to timely respond comprise a separate violation from its failure to produce documents it now admits having all along.

Boston's brief closes the issue by chiding TST for not rephrasing its request. *See* Doc. 8., at 10. Boston did not invite a rephrased request. After Boston repeatedly failed timely to respond, ignored follow-up inquiries, and made a misstatement about the documents within Boston's possession, the reasonable inference to be drawn from the Complaint is that TST did not rephrase the request because the request would not be fulfilled without litigation. See Compl. ¶¶ 27-40.

The complaint alleges, and this Court is bound to find, that Boston had public records which were reasonably described by the request, and understood the request, but chose not to timely respond to the request, not to provide those public records, to disregard its duty to "assist

persons seeking public records to identify the records sought," and instead intentionally misrepresented what documents were within its possession. Count V asserts a plausible public records violation, so the Court must deny the motion to dismiss.

**VI.**    **Michelle Wu is a Necessary Defendant.**

Last, Boston moves to dismiss as to Michelle Wu because she is sued in her official capacity. *See* Doc. 8, at 19-20. TST does not just want declaratory relief that its constitutional rights were violated in the past; it more particularly wants a *prospective* mandatory injunctive relief to enter a Mayoral Proclamation declaring "Satanic Appreciation Day" and which directs the City of Boston to grant TST a flag raising event at the Flag Pole at a specified date and time. Compl. at 15, *ad damnum* ¶ 2. The office of the mayor is a necessary defendant to get that injunction. *See Williams v. Fanning*, 332 U.S. 490, 493 (1947) ("the superior officer is an indispensable party if the decree granting the relief sought will require him to take action, either by exercising directly a power lodged in him or by having a subordinate exercise it for him"). As TST invokes this Court's equitable powers to compel the current mayor to use her authority, expressly provided by the flag-raising ordinance, personal jurisdiction over the current mayor is necessary to get a valid injunction. *See Groma, LLC v. BuildRE, LLC*, 668 F. Supp. 3d 40 (D. Mass. 2023) (injunction denied as moot for want of personal jurisdiction).

Michelle Wu is ultimately responsible for enforcing the unconstitutional acts and omissions complained of, and she has the authority to correct the issue. But she cannot be enjoined to issue the proclamation without first being made a party, so the claims against her are not "redundant." She is a necessary defendant, so she cannot be dismissed as a party.

## **CONCLUSION**

For the foregoing reasons, this Court must deny the Boston's Motion to Dismiss.

THE PLAINTIFF,
THE SATANIC TEMPLE, INC.,

By its attorneys,

Date:   June 2, 2025                      /s/ Nicholas P. Shapiro
                                          Nicholas P. Shapiro
                                          BBO# 673490
                                          nshapiro@phillips-angley.com
                                          Alexandria K. Castaldo
                                          BBO# 699014
                                          acastaldo@phillips-angley.com
                                          Steven M. Stoehr
                                          BBO # 691140
                                          sstoehr@phillips-angley.com
                                          Joseph F. Konopka
                                          BBO # 713297
                                          jkonopka@phillips-angley.com
                                          PHILLIPS & ANGLEY
                                          One Washington Mall
                                          Boston, Massachusetts 02108
                                          Tel.: (617) 367-8787/Fax: (617) 227-8992

                                                  *and*

                                          */s/Matt Kezhaya*
                                          Matt Kezhaya (*pro hac vice* pending)
                                          MN # 0402193
                                          Kezhaya Law PLC
                                          150 S. Fifth St., Suite 1850
                                          Minneapolis, MN  55402
                                          (612) 276-2216
                                          matt@kezhaya.law

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants on June 2, 2025.

                                          /s/ Nicholas P. Shapiro
                                          Nicholas P. Shapiro